IN THE UNITED STATES DISTRICT COURT FOR THE
DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| In Re: Arrest Warrant for | ) | Case No. _______________ |
| Temitope Olaniyi | ) | |
| a/k/a John Olaniyi | ) | **UNDER SEAL** |
| a/k/a “Big Africa” | ) | |
| a/k/a “Big John” | ) | |
| a/k/a “Big Red” | ) | |
| | ) | |
| United States Postal Inspection Service | ) | |
| Washington Division | ) | |

AFFIDAVIT IN SUPPORT OF CRIMINAL COMPLAINT AND APPLICATION FOR ARREST WARRANT FOR TEMITOPE OLANIYI

I, Christopher Saunders, being duly sworn, do hereby depose and state as follows:

## BACKGROUND OF AFFIANT

1. I am employed as a Postal Inspector with the United States Postal Inspection Service, authorized to conduct investigations on behalf of the United States Postal Inspection Service and have been so employed since July 2007. I am currently assigned to the District Mail Theft Team in the Washington Division of the Postal Inspection Service. Prior to my employment with the United States Postal Inspection Service, I was employed as a Special Agent with the Department of Treasury, Office of the Inspector General, Office of Investigations from May 2005 to July 2007. Prior to my employment with the Department of Treasury, Office of the Inspector General, I was employed with the Prince Georges County Police Department. During my employment with the Prince Georges County Police Department, I was assigned to the Patrol Division. I have a Bachelor of Arts Degree in Criminology and Criminal Justice from the University of Maryland, College Park Campus.

**PURPOSE OF AFFIDAVIT**

2. This affidavit is submitted in support of a criminal complaint and an application for the issuance of an arrest warrant for TEMITOPE OLANIYI, also known as John Olaniyi, "Big Africa," "Big John," and "Big Red" (hereinafter "OLANIYI"), a black male with a date of birth of April 1, 1978. I am familiar with the facts set forth in this affidavit based upon my participation in this investigation, information obtained from cooperating witnesses with personal knowledge, communications with other agents, officers, and law enforcement personnel, my review of records, documents, and other physical evidence obtained during the course of the investigation, and information gained through training and experience. Because this affidavit is being submitted for the limited purpose of setting forth probable cause, I have not included every fact known to me concerning this investigation. I have set forth only the facts that I believe are necessary to establish probable cause to charge OLANIYI with conspiracy to commit bank fraud, in violation of Title 18, United States Code, Sections 1349 and 1344.

**FACTS SUPPORTING PROBABLE CAUSE**

3. Investigators from the United States Postal Inspection Service, the Federal Bureau of Investigation, the United States Secret Service, and other law enforcement agencies have developed evidence showing that, between in or about February 2011 and September 2013, within the District of Columbia and elsewhere, OLANIYI conspired with other individuals to defraud TD Bank, SunTrust Bank, USF Federal Credit Union, PNC Bank, and Navy Federal Credit Union ("NFCU"), all financial institutions insured by the Federal Deposit Insurance Corporation ("FDIC") or the National Credit Union Administration ("NCUA").

**First TD Bank Execution of the Scheme**

4. On February 18, 2011, Co-Conspirator 1 ("CC-1") entered the TD Bank branch located in Hyattsville, Maryland (also known as the "New Carrollton" location), accompanied by an unidentified co-conspirator, hereinafter identified as Co-Conspirator 2 ("CC-2"). CC-1 and CC-2 met with CO-CONSPIRATOR 3 ("CC-3"), who worked as a customer service representative at TD Bank, and opened an account under CC-2's name with a fraudulent $9,500 check that was subsequently returned as unpaid on February 24, 2011.

5. According to information provided by CC-1 and CC-3, both of whom entered guilty pleas with regard to their involvement in the conspiracy, CC-1 continued to maintain contact with CC-3 following their initial meeting at the bank.[1] Both CC-1 and CC-3 stated that, sometime prior to March 7, 2011, CC-1 recruited CC-3 to join an ongoing conspiracy scheme to defraud TD Bank by appropriating the identities of legitimate bank customers and making large withdrawals from the victims' accounts. According to CC-3, CC-1 told CC-3 that, as part of the scheme, CC-1 used bank employees to obtain personal identifying and account information belonging to bank customers, after which CC-1 would cause to have made a government identification card, such as a driver's license, bearing the name and address of the victim account holder and the photograph of another co-conspirator who would be used to obtain money from the

[1] CC-3 started cooperating with law enforcement in March 2011. CC-1 started cooperating with law enforcement in January 2014. CC-1 and CC-3 are each represented by counsel and both have entered guilty pleas in the United States District Court for the District of Columbia. In November 2014, CC-3 was sentenced to probation and ordered to pay $171,914 in restitution for CC-3's role in the conspiracy. CC-1 is currently pending sentencing. Although CC-1 was initially detained as part of CC-1's case, CC-1 has since been released and placed on personal recognizance.

victim's account. CC-1 described the use of "runners" who would be used to cash a check or withdraw funds from the victim accounts.

6. According to CC-3, CC-1 recruited CC-3 to join the scheme and offered CC-3 $1,000 in U.S. currency for every account CC-3 provided him. CC-3 agreed to participate in the conspiracy to defraud TD Bank by providing CC-1 with customer information in exchange for money. Both CC-1 and CC-3 have stated that, per CC-1's instructions, CC-3 provided personal identifying and account information relating to TD Bank customers, including each customer's name, date of birth, social security number, signature, address, account number, date of account opening, and account balance.

7. CC-3 admitted to accessing the TD Bank computer system on multiple dates in March 2011 to obtain customer information for at least five different bank customers. CC-3 subsequently provided the customer information to CC-1.

8. Using the information provided by CC-3, CC-1 conspired with OLANIYI, Co-Conspirator 4 ("CC-4"), Co-Conspirator 5 ("CC-5"), Co-Conspirator 6 ("CC-6"), and Co-Conspirator 7 ("CC-7"), among other co-conspirators, to execute the scheme against TD Bank. OLANIYI, CC-1, and CC-4 were the leaders and organizers of the scheme, while CC-5, CC-6, and CC-7 were the "runners" who entered the bank branches posing as the victim accountholders.

9. CC-4, CC-5, and CC-6 also entered guilty pleas for their respective roles in the conspiracy.[2] According to CC-1 and CC-4, OLANIYI provided the false

[2] CC-4 and CC-6 started cooperating with law enforcement in February 2014. CC-5 started cooperating with law enforcement in September 2013. CC-4, CC-5, and CC-6 are each represented by counsel and have entered guilty pleas in the United States District Court for the District of Columbia. CC-4 and CC-5 are currently pending sentencing. In December 2014, CC-6 was sentenced to time-served in prison, which

identifications for the "runners" to use when entering the bank branches to withdraw funds from the victim accounts or cash checks drawn from victim funds. CC-1 and CC-4 explained that CC-1 obtained the victims' personal identifying and account information from CC-3, and subsequently provided the information to CC-4, who was the primary conduit to OLANIYI and the false identifications.

10. According to CC-1 and CC-4, OLANIYI provided false identifications in the names of victim E.H. and victim S.P., which were used by CC-5 and CC-6, respectively, on multiple occasions to make unauthorized withdrawals from the accounts of E.H. and S.P.

11. In furtherance of the scheme, CC-1 and CC-4 drove CC-5 and CC-6 to different TD Bank branches in and around the Washington, D.C. metro area to conduct transactions on the victim accounts. According to CC-1 and CC-4, OLANIYI followed or met them outside of the bank branch to provide the false identifications. CC-1 and CC-4 also explained that OLANIYI required them to return the false identifications for CC-5 and CC-6 to OLANIYI after each transaction was completed.

*Identification of OLANIYI*

12. CC-4 stated that CC-4 knows OLANIYI only by the names "Big Africa" and "Big John." CC-4 was shown a confirmatory photograph of OLANIYI and positively identified OLANIYI as the individual CC-4 knows as "Big Africa" and the individual with whom CC-4 conspired in this and other executions of the fraud scheme.

13. CC-1 does not know the name of the individual who provided the fake identifications for the scheme. CC-1 also stated that CC-1 referred to this individual as

---

amounted to 10 months that CC-6 had been detained during the pendency of CC-6's case, as well as restitution in the amount of $83,004, for CC-6's role in the conspiracy.

the "African guy." When shown a six-person photo array, CC-1 positively identified OLANIYI as the individual to whom he referred as the "African guy," and with whom CC-1 conspired in the fraud scheme.

*Unauthorized Withdrawals from the Victim TD Bank Accounts*

14. Through investigation, your affiant has identified a number of instances in which CC-4, CC-5, CC-6, and CC-7 posed as account holders whose personal identifying and account information had been provided to CC-1 by CC-3, and conducted transactions withdrawing funds from the victims' accounts.

15. For example, on March 25, 2011, CC-1 and CC-4 drove CC-6 to the TD Bank branch located in Germantown, Maryland, and instructed CC-6 to withdraw $17,000 from the account of S.P. CC-6 made the withdrawal and used a portion of the $17,000 to purchase an $8,000 TD Bank Official Check (No. 33028770-3), made payable to S.P. Bank surveillance images from March 25, 2011, at approximately 10:35 a.m., show CC-6 standing at the counter of the TD Bank branch located in Germantown, Maryland, conducting this transaction. According to CC-6, after exiting the bank branch, CC-6 provided CC-1 with the money CC-6 obtained.

16. A short while later on March 25, 2011, CC-1 and CC-4 drove CC-5 to another TD Bank branch located in Germantown, Maryland, and instructed her to withdraw $16,004 from the account of E.H. CC-5 made the withdrawal and used a portion of the $16,004 to purchase a $7,000 TD Bank Official Check (No. 33030857-2), made payable to E.H. Bank surveillance images from March 25, 2011, at approximately 11:15 a.m., show CC-5 standing at the counter of this particular TD Bank branch

conducting this transaction. According to CC-5, after exiting the bank branch, CC-5 provided CC-1 with the money.

17. Later on March 25, 2011, CC-1 and CC-4 drove CC-6 to the TD Bank branch located at 4849 Wisconsin Avenue, N.W., in the District of Columbia and instructed CC-6 to cash the same $8,000 TD Bank Official Check (No. 33028770-3) that CC-6 obtained earlier in the day. Bank surveillance images from March 25, 2011, at approximately 12:09 p.m., show CC-6 standing at the counter of this particular TD Bank branch conducting this transaction. CC-6 stated that CC-6 followed the instructions provided by CC-1 and CC-4, cashed the check, and provided CC-1 with the money.

18. Later on March 25, 2011, CC-1 and CC-4 drove CC-5 to the TD Bank branch located at 1611 Wisconsin Avenue, N.W., in the District of Columbia and instructed CC-5 to cash the same $7,000 TD Bank Official Check (No. 33030857-2) that CC-5 obtained earlier in the day. Bank surveillance images from March 25, 2011, at approximately 12:37 p.m., show CC-5 standing at the counter of this particular TD Bank branch conducting this transaction. CC-5 stated that CC-5 followed the instructions provided by CC-1 and CC-4, cashed the check, and provided CC-1 with the money.

19. CC-5 and CC-6 conducted similar transactions on the accounts of victims E.H. and S.P. on March 26 and 28, 2011.

20. In each instance, CC-1 and CC-4 split the majority of the stolen proceeds between themselves, and paid a smaller portion to CC-3, CC-5, CC-6, and OLANIYI.[3]

[3] CC-1 stated that the individual to whom he referred as the “African guy” (and who CC-1 positively identified as OLANIYI) was paid $2,500 per transaction for his role in the scheme. CC-1 also stated that the “runners” (i.e., CC-5 and CC-6) were also paid $2,500 per transaction, and that the co-conspirator working inside the bank, CC-3, was paid $5,000 for each stolen identity that was provided. CC-1 also noted that CC-1 and

21. CC-4 also used a false identification that OLANIYI provided in the name of L.S. to make unauthorized transactions on the account of victim L.S. on at least seven occasions, during which CC-4 withdrew funds from the account of L.S. or cashed a TD Bank official check obtained using funds from the account of L.S. For example, on March 11, 2011, at approximately 11:25 a.m., CC-4 entered the TD Bank branch located at 4849 Wisconsin Avenue, N.W., in the District of Columbia, and made an unauthorized withdrawal in the amount of $8,000 from the account of victim L.S. Bank surveillance images from March 11, 2011, at approximately 11:25 a.m., show CC-4 standing at the counter of this particular TD Bank branch conducting this transaction.

22. CC-1 and CC-4 also used the customer information provided by CC-3 to make and attempt to make unauthorized withdrawals on the account of K.M. On March 16, 17, and 18, 2011, CC-1 and CC-4 drove CC-7 to four different TD Bank branch locations and instructed CC-7 to withdraw money from the account of K.M. On three of the four occasions, CC-7 successfully made the withdrawal, exited the bank branch, and provided CC-1 with the money. On the fourth occasion, CC-7 attempted to withdraw $8,000 from the account of K.M., however, the transaction was not successful.

23. CC-3 also provided CC-1 with information relating to TD Bank customer C.H., which members of the conspiracy used to obtain money through two counterfeit checks drawn on C.H.'s account in the amounts of $4,270 and $18,700 on or about April

---

CC-4 split the remainder of the proceeds. CC-4 has stated that the "runners" received between $1,500 - $2,500 per transaction and CC-1, CC-4, and OLANIYI split the rest evenly. CC-3 stated that CC-1 paid CC-3 a total of $2,000, which represented $1,000 each for two sets of identities and account information. CC-3 stated that, although CC-3 provided additional identities and account information to CC-1, CC-3 did not receive any additional money, as CC-1 advised the additional identities were unusable. CC-5 and CC-6 stated they each received approximately $4,000 in exchange for their participation.

11, 2011. Based on a review of the relevant bank records, co-conspirators successfully obtained approximately $11,910 from the two counterfeit checks.

24. Overall, during the course of the scheme, the members of the conspiracy unlawfully attempted to obtain $191,424, and actually obtained $171,914 from TD Bank accounts based on customer information provided by CC-3 to CC-1, and thereafter accessed and used by OLANIYI, CC-4, CC-5, CC-6, and CC-7.

**Additional Executions of the Scheme by OLANIYI**

25. CC-4 admitted to participating in other executions of the fraud scheme with OLANIYI. In particular, CC-4 stated that CC-4 assisted OLANIYI in executing the fraud scheme against SunTrust Bank, PNC Bank, Bank of America, Wachovia, and Nordstrom. Among the aspects of the scheme, CC-4 stated that OLANIYI would have a check deposited into an individual's account and then have someone enter the bank branch to make a withdrawal of the funds and bring OLANIYI the money. CC-4 explained that OLANIYI used both counterfeit checks and actual checks that had not been authorized by the account holder. CC-4 also stated that OLANIYI would use both individual and business accounts in executing the scheme.

26. CC-4 also stated that OLANIYI always provided CC-4 with the fake identifications used for executing the scheme. CC-4 reported hearing OLANIYI state that OLANIYI could obtain fake identifications for virtually all 50 states and that CC-4 had seen fake identifications that OLANIYI procured for Washington, D.C., Maryland, Virginia, and North Carolina.

**<u>SunTrust Bank Execution of the Scheme</u>**

27. On or about November 30, 2011, J.M. reported to the Anne Arundel County Police Department ("AAPD") that he had been the victim of identity theft, relating to two fraudulent, unauthorized wire transfers, totaling $190,521.82, that were sent from J.M.'s account at SunTrust Bank.

28. Based on subsequent investigation, members of law enforcement learned that, on or about November 23, 2011, an unknown co-conspirator entered a SunTrust Bank branch located in Edgewater, Maryland, and presented a fake Maryland driver's license reflecting J.M.'s name, date of birth, and driver's license number, but a photograph of the unknown co-conspirator. In addition, the unknown co-conspirator presented a TD Bank card bearing J.M.'s name as a secondary form of identification. The teller verified the transaction and transferred $95,521.82 from J.M.'s SunTrust Bank account to a JP Morgan Chase account in the name of Allen Homes LLC. On or about November 28, 2011, the same unknown conspirator returned to the SunTrust Bank branch located in Edgewater, Maryland, presented fake identification in the name of J.M., and wire transferred an additional $95,000.00 from J.M.'s SunTrust Bank account to the Allen Homes LLC account held at JP Morgan Chase.

29. SunTrust Bank surveillance images show the same unknown subject visited the branch and transferred the money on both November 23 and 28, 2011.

30. Bank records for the Allen Homes LLC account held at JP Morgan Chase also reflect the incoming wires from J.M.'s SunTrust Bank account, and further reflect outgoing wires totaling $145,000 to a PNC Bank account held in the name of Donovan Homes LLC, as well as a $5,000 wire to a TD Bank account held in the name of JWM

Construction LLC,[4] a telephone transfer in the amount of $14,900, as well as additional transfers and a withdrawal totaling $25,500. All of these transfers took place between November 23 and 30, 2011.

31. On or about November 30, 2011, members of the Dover Delaware Police Department ("DDPD") arrested Co-Conspirator 8 ("CC-8") for using a fraudulent identification during an attempt to withdraw funds from a PNC Bank account held in the name of Donovan Homes LLC.[5] According to a DDPD arrest report, CC-8 requested a withdrawal of $25,000 from the Donovan Homes LLC account at PNC Bank and provided the teller with a fake District of Columbia driver's license in the name of J.D. The PNC Bank employee became suspicious of the fake identification and called the police, after which CC-8 was arrested. CC-8 was also found in possession of three Visa credit cards with business names "Donovan Homes LLC," "Allen Homes LLC," and "Trenton Cailouet Homes LLC," along with a PNC Bank withdrawal ticket for $25,000.

32. Following his arrest and waiver of rights on November 30, 2011, CC-8 provided his actual identity and admitted that he had been trying to withdraw money from an account using a fraudulent identification. CC-8 stated that he had been provided the fraudulent identification as well as the fraudulent credit cards by an individual he only

[4] According to records from TD Bank, on or about November 17, 2011, an unknown subject opened a business account in the name of JWM Construction LLC using J.M.'s full name, DOB and SSN. On or about April 26, 2012, a law office in the name of T.M. filed a complaint with BB&T Bank reporting that a counterfeit check made payable to JWM Construction in the amount of $30,351 had been drawn on the law office's business bank account and deposited at TD Bank. According to publicly available online court records, T.M. represented OLANIYI during this time period.

[5] In January 2014, CC-8 was indicted by a federal grand jury sitting in the District of Maryland and charged with Conspiracy to Commit Bank Fraud, in violation of 18 U.S.C. § 1349. The U.S. Attorney's Office for the District of Maryland and CC-8 are currently engaged in plea discussions.

knew as "Big Africa." CC-8 stated that "Big Africa" provided him with the fake identification and credit cards with further instructions on how to conduct the transaction at PNC Bank. CC-8 noted that "Big Africa" instructed CC-8 to withdraw $25,000 from the Allen Homes account, return to Maryland following the transaction, and give "Big Africa" the money. CC-8 stated that he did not know the identity of "Big Africa" and had no working phone numbers for him. CC-8 added that "Big Africa" was from Nigeria and lived in Laurel, Maryland.

33. On or about October 25, 2013, agents with the United States Secret Service ("USSS") interviewed CC-8, who explained that CC-8 was introduced to Big Africa by a mutual acquaintance who knew that CC-8 needed money. CC-8 reported that, during a meeting between the two, "Big Africa" took a photograph of CC-8 and provided CC-8 with a fake driver's license and Visa cards the next time they met.[6] According to CC-8, "Big Africa" drove CC-8 to Dover, Delaware, and instructed CC-8 to go into PNC Bank and withdraw money from the Allen Homes LLC account. During the interview with the USSS in October 2013, CC-8 was shown approximately ten photos of co-conspirators in the scheme and CC-8 identified pictures of OLANIYI as the person he knows as "Big Africa." CC-8 also acknowledged that he had not been entirely truthful when interviewed by DDPD in November 2011, when CC-8 stated that CC-8 was to drive back to Maryland to provide the money to "Big Africa" and by failing to advise DDPD that "Big Africa" had driven CC-8 to Delaware.

[6] During a subsequent interview with law enforcement agents from the United States Postal Inspection Service and the Treasury Department, Office of Inspector General, CC-8 stated that CC-8 provided "Big Africa" with two photographs of CC-8, which "Big Africa" used to make two fake identifications for CC-8.

34. During a subsequent interview with law enforcement in October 2015, CC-8 again identified OLANIYI in a confirmatory photograph as the individual he knows as "Big Africa."

**PNC Bank Execution of the Scheme – Victim Company A**

35. On or about February 17, 2012, investigators with PNC Bank contacted an agent with the USSS regarding several fraudulent check deposits into PNC Bank accounts from fraudulent checks drawn from the account of Victim Company A. As part of the scheme, co-conspirators used accounts belonging to Co-Conspirator 9 ("CC-9"), Co-Conspirator 10 ("CC-10"), Co-Conspirator 11 ("CC-11"), and Co-Conspirator 12 ("CC-12").

36. Based on follow-up investigation, law enforcement agents obtained surveillance showing OLANIYI and other co-conspirators conducting transactions on the subject accounts.

37. Representatives of PNC Bank confirmed that four checks deposited into the PNC Bank accounts of CC-9, CC-10, CC-11, and CC-12 were counterfeit, fraudulent checks. When interviewed by law enforcement, a representative of Victim Company A also confirmed that some of the company's checks had been fraudulently deposited into numerous bank accounts and provided law enforcement with copies of the four checks payable to CC-9, CC-10, CC-11, and CC-12.

*CC-9's PNC Account*

38. On or about February 10, 2012, a check drawn on the account of Victim Company A in the amount of $9,750.00 was deposited into the PNC Bank account belonging to CC-9. Bank surveillance images from February 10, 2012, at approximately

3:18 pm, show OLANIYI standing at the counter of the PNC Bank branch located at 800 H Street, NE, Washington, D.C. at the time of this transaction.

39. According to bank records for the PNC Bank account belonging to CC-9, on or about February 13, 2012, three check-card purchases were made at Walmart stores located in Laurel and Severn, Maryland, each in the amount of $1,999.20. The bank records also reflect ATM withdrawals from CC-9's account totaling approximately $1,500 on February 13, 2012, in Laurel and Glen Burnie, Maryland. The bank records also reflect additional check card purchases totaling approximately $740.

40. On or about February 27, 2012, an agent with the USSS interviewed CC-9, who initially stated that she had left her purse in a shopping cart at Walmart and later returned to find her purse intact, but missing her PNC Bank card. Upon further questioning, CC-9 admitted that this information was not true and that she had provided her account information to an unknown male who approached her at the gym at the University of Maryland Eastern Shore ("UMES") and asked if she needed some extra money.[7] CC-9 stated that she provided the unknown male with her PNC Bank card and PIN. According to CC-9, when the unknown male called her three days later and advised that he was going to use her bank card and account, CC-9 purportedly told the unknown male that she did not want "to be a part of it anymore" and would "rather starve than do that." CC-9 later received a call from PNC Bank advising that transactions had been made on her account relating to a fraudulent check.

[7] CC-9 also filed a false police report with the Fruitland Police Department on or about February 16, 2012, stating that her PNC debit card had been stolen from a shopping cart at Walmart. CC-9 later admitted to an agent with the USSS that the information she provided to the Fruitland Police Department was not true.

41. During a subsequent interview in October 2015, CC-9 stated that an unknown male at the gym at UMES asked her if she wanted to make some money. CC-9 agreed and provided the unknown male with her PNC Bank card and PIN. According to CC-9, the unknown male subsequently called her from a blocked number and requested her social security number, which CC-9 refused to provide. According to CC-9, approximately one week after this telephone conversation with the unknown male, CC-9 received a call from PNC Bank about a "negative transaction" on her account. When CC-9 went to the PNC Bank branch, she was shown a copy of the deposit ticket and confirmed that the handwriting on the deposit ticket was her handwriting. CC-9 stated that she did not know how or who put money into her account. CC-9 also stated that she initially provided false information relating to her wallet being stolen while at Walmart because she had been "freaking out."[8]

*CC-10's PNC Account*

42. On or about February 10, 2012, a check drawn on the account of Victim Company A in the amount of $9,650.00 was deposited into the PNC Bank account belonging to CC-10. Bank surveillance images from February 10, 2012, at approximately 4:27 pm, show OLANIYI standing at the counter of the PNC Bank branch located at 2000 Martin Luther King Avenue, SE, Washington, D.C. (the "Anacostia" branch) at the time of this transaction.

[8] During the interview with law enforcement in October 2015, CC-9 also admitted to participating in a scheme with CC-13 and CC-14, who "helped out" students at UMES by depositing money into their bank accounts. CC-9 advised that CC-13 recruited her into the scheme. According to CC-9, CC-14 called CC-13 to advise that money had been deposited into a student's bank account, and CC-13 instructed the student to withdraw the money, after which the student provided the money to CC-13, who provided it to CC-14. According to CC-9, CC-13 oversaw approximately five people in the scheme, including CC-9 and CC-10.

43. According to bank records for the PNC Bank account belonging to CC-10, on or about February 13, 2012, three check-card purchases were made at Walmart stores located in Laurel and Severn, Maryland in the amounts of $1,999.90, $1,999.20, and $1,999.20. The bank records also reflect ATM withdrawals from CC-10's account totaling approximately $1,500 on February 13, 2012, in Glen Burnie and Laurel, Maryland. The bank records also reflect additional check card purchases totaling approximately $470.

44. On or about February 29, 2012, an agent with the USSS interviewed CC-10, who initially stated that he had lost his PNC debit card in and around February 7, 2012, along with a "sticky note" that he kept attached to the card with his PIN, user name, and password. During the course of the interview, CC-10 admitted this was not true and explained that he had been approached at the end of January 2012 by a male known as "TJ" at UMES. According to CC-10, "TJ" asked him if he was interested in earning extra money and CC-10 agreed, after which "TJ" offered to pay CC-10 $500 to allow "TJ" to deposit a check from his company into the account and use it briefly. According to CC-10, approximately two weeks later, "TJ" called him from a blocked number and requested his social security number, which CC-10 refused to provide.

45. During a subsequent interview in October 2015, CC-10 stated that Co-Conspirator 13 ("CC-13") approached him about making some extra money. CC-10 explained that CC-13 was known as someone who helped students at UMES make money. CC-10 advised that CC-13 asked for information relating to CC-10's accounts at Bank of America and PNC Bank, which CC-10 provided.[9] With respect to the PNC

[9] With respect to the Bank of America account, CC-10 stated that, shortly after

Bank account, CC-10 stated that CC-13 instructed him to withdraw money from the account after a check from Victim Company A was deposited into his account. When CC-10 went to the PNC branch located in Baltimore, Maryland, a PNC Bank employee called the police, who advised CC-10 that the check deposited into his account was a forged check. CC-10 admitted that, when he was subsequently interviewed by the USSS, he provided false information regarding the individual who purportedly recruited him (i.e., "JP"), when in fact, CC-13 had recruited CC-10 to participate in the scheme. CC-10 also advised that he knew that CC-13 had recruited CC-9 (who is CC-13's girlfriend) to participate as well. CC-10 also admitted that he told CC-11 about the scheme and brought CC-11 to CC-13 to participate in the scheme.

*CC-11's PNC Account*

46. On or about February 10, 2012, a check drawn on the account of Victim Company A in the amount of $9,850.00 was deposited into the PNC Bank account belonging to CC-11. Bank surveillance images from February 10, 2012, at approximately 3:43 pm, show an individual appearing similar to OLANIYI standing near the counter of the PNC Bank branch located at 650 Pennsylvania Avenue, SE, Washington, D.C. (the "Capitol Hill" branch) at the time of this transaction. In one of the surveillance images, the individual's face is not visible and in the other surveillance image, the individual is facing to the side, making it difficult to observe the individual's

---

providing CC-13 with his bank information, there were four different deposits into his Bank of America account from Home Depot. CC-10 withdrew the money from this account upon being notified by CC-13 that a deposit had been made and provided the cash to CC-13. In exchange, CC-10 was paid between $200 and $500 per deposit. CC-13 advised CC-10 that the money was from a business contractor who worked for Home Depot and tried to help students "on the side." CC-10 stated that he asked CC-13 if the money was "legit" and CC-13 responded, "Yes." CC-10 advised that his Bank of America account was closed because of the fraudulent Home Depot transactions.

face. The portions of the individual visible in both surveillance images are consistent with OLANIYI's appearance and the clothing worn by the individual appears identical to the clothing OLANIYI is observed wearing at approximately 3:18 and 4:27 p.m. the same day, when conducting transactions in the accounts belonging to CC-9 and CC-10.

47. According to bank records for the PNC Bank account belonging to CC-11, on or about February 13, 2012, three check-card purchases were made at Walmart stores located in Laurel and Severn, Maryland, each in the amount of $1,999.20. The bank records also reflect ATM withdrawals from CC-11's account totaling approximately $1,500 on February 13, 2012, in Laurel and Glen Burnie, Maryland. The bank records also reflect additional check card purchases totaling approximately $2,400.

48. CC-11 has not yet been interviewed by law enforcement agents. CC-10 advised law enforcement agents in October 2015 that he believes that CC-11 is currently residing in Africa based on CC-11's social media posts.

*CC-12's PNC Account*

49. On or about February 10, 2012, a check drawn on the account of Victim Company A in the amount of $9,214.00 was deposited into the PNC Bank account belonging to CC-12. Bank surveillance images from February 10, 2012, at approximately 4:11 pm, show an unknown male co-conspirator standing at the counter of the PNC Bank branch located in Fredericksburg, Virginia (the "England Run" branch) at the time of this transaction.

50. According to bank records for the PNC Bank account belonging to CC-12, on or about February 14, 2012, three check-card purchases were made at a Walmart store located in Woodbridge, Virginia, each in the amount of $500.60. The bank records also

reflect ATM withdrawals from CC-12's account totaling $205.50 on February 14, 2012, in Woodbridge, Virginia. The bank records also reflect additional check card purchases totaling approximately $425.

51. The bank records also reflect a withdrawal from CC-12's account in the amount of $7,400. Bank surveillance images from February 11, 2012, at approximately 9:27 a.m., show CC-12 standing at the counter of the PNC Bank branch located in Fredericksburg, Virginia (the "England Run" branch) at the time of the withdrawal transaction. Surveillance images also show another individual in the branch who appears to be the same as the unknown male co-conspirator who deposited the counterfeit check into CC-12's account on February 10, 2012. Surveillance images for the parking lot outside of the branch show CC-12 meeting briefly with the unknown male co-conspirator after CC-12 completed the withdrawal transaction.

52. On or about March 7 and March 19, 2012, an agent with the USSS interviewed CC-12, who stated that she voluntarily gave her PNC Bank account information, including her debit card and PIN, to CC-15. According to CC-12, CC-15 approached her and asked for her account information, stating that his father was purportedly ill and that he needed CC-12's bank account to help send money. CC-12 understood that CC-15 deposited a check into her account and had attempted to purchase money orders with CC-12's account, but the funds had not yet cleared. Shortly thereafter, CC-15 called CC-12 and asked her to assist him in withdrawing some of the money from her account. CC-12 advised that CC-15 instructed her to go to their local PNC Bank branch and withdraw $7,400 from her account. When shown the surveillance from the withdrawal transaction, CC-12 identified CC-15 as the unknown male in the

surveillance footage and advised that CC-15 waited for her near the entrance to the bank while she completed the transaction

**Second TD Bank Execution of the Scheme**

53. On August 15, 2013, Co-Conspirator 16 ("CC-16") entered the TD Bank branch located in New Carrollton, Maryland, where CC-16 opened two business bank accounts in the name of Company B, a limited liability company. One of the business bank accounts (ending -3785) was denoted as the purported "payroll" account for Company B. Surveillance images from August 15, 2013, at approximately 3:14 p.m., show CC-16 opening the accounts.

54. CC-16 stated to law enforcement that CC-16 was approached by an individual known as "Tai," who wanted CC-16 to open a business account that could be used to receive a large wire transfer, after which other co-conspirators unknown to CC-16 would withdraw the funds from the business account. CC-16 stated that CC-16 had been told that, as long as CC-16 filed a police report and an affidavit with the bank, CC-16 would not get in any trouble. CC-16 believed that CC-16 may be paid up to $50,000 for CC-16's role.[10]

55. According to CC-16, prior to opening the business bank accounts at TD Bank, "Tai" drove CC-16 to Baltimore, Maryland to set up the fake business and then to TD Bank to open the business bank account. Records from Maryland's Department of

---

[10] CC-16 is not represented by counsel. Law enforcement initially approached CC-16 in October 2013, and CC-16 agreed to cooperate with the investigation. CC-16 is hopeful that CC-16's cooperation may result in a more lenient criminal disposition for CC-16's role in the conspiracy, including no charges being filed against CC-16. No promises have been made to CC-16 regarding an ultimate disposition.

Assessments & Taxation reveal that CC-16 registered Company B as a limited liability company at approximately 12:26 p.m. on or about August 15, 2013.

56. According to CC-16, CC-16 subsequently met an individual for whom "Tai" worked, who became known to CC-16 as "John." CC-16 explained that "John" assured CC-16 that CC-16 would not get in trouble.

57. When shown images taken from surveillance videos of co-conspirators involved in the scheme, CC-16 positively identified OLANIYI as the person CC-16 knew as "John."

58. On or about September 16, 2013, the business bank account (ending -3785) in the name of Company B received a wire from the USF Federal Credit Union account belonging to S.K. in the amount of $78,560.35. Following execution of the fraud, TD Bank confirmed with USF Federal Credit Union that the $78,560.35 wire into the account was fraudulent and that USF Federal Credit Union customer S.K. had been the victim of an email intrusion, which resulted in the fraudulent wire being sent to the business account of Company B at TD Bank. S.K. also signed an Affidavit of Forgery noting that the written authorization for the wire transfer was a forgery.

59. Beginning on September 17, 2013, other members of the conspiracy entered TD Bank branches and cashed checks drawn on the business bank account ending -3785 and made payable in the names of various individuals for whom the co-conspirators possessed fake identifications.

60. For example, on or about September 17, 2013, an unknown male conspirator entered the TD Bank branch located at 901 7th Street, N.W., Washington, D.C. Surveillance images provided by TD Bank show the unknown male in the bank

branch wearing a red and white shirt at or about 4:00 p.m. on September 17, 2013. At or about this time, the unknown male cashed business check number 1008 from the TD Bank account ending -3785, which was endorsed by and payable to B.J. in the amount of $6,391.56.

61. Similarly, on multiple occasions on September 17 and 18, 2013, Co-Conspirator 17 ("CC-17") entered different TD Bank branches located in Virginia and cashed several fraudulent checks drawn on the business account ending -3785 and made payable to different individuals. In each instance, CC-17 provided a fake identification bearing the name of the payee on the check, which caused the teller to cash the check. In each instance, bank surveillance images show CC-17 standing at the counter of the TD Bank branch conducting the transaction. The following table outlines the fraudulent checks that CC-17 cashed in furtherance of the scheme:

| **Date/Time** | **Check No.** | **Amount** | **Payee** | **Branch** |
|---|---|---|---|---|
| 9/17/2013 3:03 p.m. | 1002 | $6,351.18 | B.J. | Richmond Highway, Alexandria, VA |
| 9/17/2013 3:40 p.m. | 1003 | $6,474.81 | T.M. | South Van Dorn Street, Alexandria, VA |
| 9/17/2013 4:12 p.m. | 1004 | $6,289.63 | C.M. | Wilson Boulevard, Arlington, VA |
| 9/17/2013 4:54 p.m. | 1005 | $6,534.16 | N.P. | Lee Highway, Arlington, VA |
| 9/18/2013 3:26 p.m. | 1006 | $6,725.37 | D.P. | Maple Avenue East, Vienna, VA |
| 9/18/2013 3:07 p.m. | 1007 | $6,725.37 | R.S. | Tyson's Corner, VA |

62. Continuing on or about September 18, 2013, another unknown male conspirator entered the TD Bank Branch located on Colesville Road in Silver Spring, Maryland. Surveillance images show the unknown male wearing a dark shirt at or about

5:15 p.m., when he cashed business check number 1009 from the TD Bank account ending -3785, which was endorsed by and payable to R.S. in the amount of $9,691.42.

63. CC-17 and the other members of the conspiracy successfully withdrew the funds identified above, which totaled $55,183.50.

64. CC-17 also attempted an additional transaction that was not successful. Specifically, on September 18, 2013, CC-17 entered a TD Bank branch located in Fairfax, Virginia. Surveillance images show CC-17 in the bank at or about 5:03 p.m., attempting to cash business check number 1012 from the TD Bank account ending -3785, which was endorsed by and payable to J.D. in the amount of $7,843.73. A TD Bank employee recognized CC-17 from a previous transaction and called the police, because the employee believed that CC-17 was using a false identification. CC-17 left the bank before police arrived.

65. When TD Bank called CC-16, as the owner of Company B, to verify the authenticity of the checks being presented, CC-16 allowed a friend, Co-Conspirator 18 ("CC-18), to answer CC-16's cell phone to provide authorization to TD Bank for the checks to be cashed. When interviewed by law enforcement, CC-18 admitted that CC-18 knew "John" and that CC-18 had engaged in the scheme with "John." CC-18 also stated that CC-18 answered CC-16's cell phone and provided authorization on behalf of Company B for the fraudulent checks to be cashed.

66. When shown surveillance images of co-conspirators involved in the scheme, CC-18 positively identified OLANIYI as the person CC-18 knew as "John."

67. After discovering the fraud in the business account of Company B, TD Bank contacted CC-16, who falsely informed TD Bank investigators that CC-16's car

had been broken into and that CC-16's TD Bank account information and cell phone had been stolen. CC-16 also told the TD Bank investigator that CC-16 had filed a police report with the Hyattsville Police Department, alleging the theft from CC-16's unlocked vehicle. When CC-16 was subsequently interviewed by law enforcement in October 2013, CC-16 falsely reported that his/her TD Bank account information and cell phone had been stolen. During the course of the same interview, CC-16 admitted that he/she had not been truthful and that his/her account information and cell phone had not been stolen, but rather that he/she had participated in the scheme to defraud TD Bank. CC-16 also later explained that "John" instructed CC-16 to state that his/her account information and cell phone had been stolen if he/she was confronted by bank investigators.

68. CC-16 and CC-18 also stated that "John" and "Tai" asked them to open other accounts at Eagle Bank and Citibank.

69. When interviewed, CC-16 acknowledged that CC-16 received money from "John" in exchange for participating in the scheme and that CC-16 provided CC-18 with $1,000 of the money that CC-16 received.

70. On or about October 9, 2013, CC-17 was arrested pursuant to a warrant issued on October 8, 2013, in the Eastern District of Virginia. After the arrest and waiver of rights, CC-17 admitted to his role in the scheme to defraud TD Bank. CC-17 also admitted to perpetrating similar schemes for years.[11]

[11] In December 2013, CC-17 entered a guilty plea in the Eastern District of Virginia to Counts 1 and 17 of the Indictment against him, charging Conspiracy to Commit Bank Fraud, in violation of 18 U.S.C. § 1349, and Obstruction of Justice, in violation of 18 U.S.C. § 1512(c), relating to his involvement in the fraud against TD Bank, as well as another aspect of the fraud scheme involving SunTrust Bank. CC-17 was subsequently sentenced to 60 months in prison.

71. CC-17 also claimed that another individual, known to him as "T," facilitated his fraud. CC-17 explained that "T" always provided him with false identification and claimed that he probably used 30-40 different fake IDs to commit fraud in the last five years. CC-17 said "T" would drive him to register the fake businesses, drive him to the banks and tell him which accounts to open and then from branch to branch giving him his ID and the checks to cash. CC-17 stated he would be paid approximately thirty percent of the face value of the checks he cashed and roughly $100.00 for each of the accounts/businesses he opened.

72. CC-17 stated that the phone number used by "T" was (###) ###- 4609.

73. Following his arrest in October, 2013, CC-17 placed several phone calls from the Alexandria Adult Detention Center ("ADC") in Alexandria, Virginia. The phone calls were recorded by the Alexandria Sherriff's Department and accessed by members of law enforcement, including an agent with the USSS who listened to the recordings. During one call, CC-17 asked to be provided with a phone number for "Big Red," to which the person on the other end of the line responded by stating that the number was (###) ###- 5066. Later in the call, CC-17 told the person on the other end to have "Africa" get him a lawyer.

74. In another October 2013 call, CC-17 told the person on the other end of the line to find the little red thing in which he (CC-17) kept his identifications and to find "Africa's" card and then to keep it under wraps.

75. CC-16 and CC-18 also identified one of OLANIYI's phone numbers as (###) ###-5066 and another of OLANIYI's phone number as (###) ###- 1148.[12]

[12] According to CC-16, at some point, OLANIYI provided CC-16 with the cell

76. Records provided by Sprint confirm that phone number (###) ###-0147 was registered to CC-17. Call logs provided by Sprint show that CC-17's phone number was in contact with OLANIYI's (###) ###-5066 phone number approximately sixteen times on or about September 27, 2013; and in contact with OLANIYI's (###) ###-1148 phone number approximately twenty-eight times between on or about August 29, 2013, and on or about September 25, 2013.

77. Phone records obtained from Cricket show that OLANIYI's phone number (###) ###-5066 was in contact with CC-16, CC-17, CC-18, and "Tai" during September and October 2013.

78. Cricket phone records show, in relevant part, that on or about September 16, 2013, OLANIYI called CC-16, CC-18, and another co-conspirator after the USF Federal Credit Union wire was debited to the TD Bank account ending in -3785.

79. Phone records obtained from Cricket show that OLANIYI's number ( ###) ###-5066 had the following relevant contacts/conduct on or about September 17, 2013:

| | | | |
|---|---|---|---|
| (###) ###-5066 OLANIYI | CC-18's Cell Phone | 09/17/2013 | 14:58:07 |
| (###) ###-5066 OLANIYI | (###) ###-4609 "T" | 09/17/2013 | 15:02:53 |
| CC-17 Cashes $6,351.18 Check at TD Bank | | 9/17/2013 | 15:03:00 |
| | | | |
| (###) ###-5066 OLANIYI | CC-18'S Cell Phone | 09/17/2013 | 15:09:35 |
| (###) ###-5066 OLANIYI | ( ###) ###-4609 "T" | 09/17/2013 | 15:36:46 |
| CC-17 Cashes $6,474.81 Check at TD Bank | | 09/17/2013 | 15:40:00 |
| | | | |
| (###) ###-5066 OLANIYI | (###) ###-4609 "T" | 09/17/2013 | 16:09:31 |
| (###) ###-5066 OLANIYI | CC-18's Cell Phone | 09/17/2013 | 16:09:55 |

---

phone that used the number (###) ###- 1148 to use in executing the scheme.

| | | | |
|---|---|---|---|
| CC-17 Cashes $6,289.63 Check at TD Bank | | 09/17/2013 | 16:12:00 |
| (###) ###-5066 OLANIYI | CC-18'S Cell Phone | 09/17/2013 | 16:22:31 |
| UNSUB Cashes $6,391.56 Check at TD Bank | | 09/17/2013 | 16:19:00 |
| (###) ###-5066 OLANIYI | (###) ###-4609 "T" | 09/17/2013 | 16:35:45 |
| (###) ###-5066 OLANIYI | CC-18'S Cell Phone | 09/17/2013 | 16:39:41 |
| CC-17 Cashes $6,534.16 Check at TD Bank | | 09/17/2013 | 16:54:00 |

80. Phone records provided by Cricket show OLANIYI's number ( ###) ###-5066 had the following relevant contacts on or about September 18, 2013:

| | | | |
|---|---|---|---|
| (###) ###-5066 OLANIYI | (###) ###-4609 "T" | 09/18/2013 | 14:44:37 |
| (###) ###-5066 OLANIYI | CC-18'S Cell Phone | 09/18/2013 | 14:45:31 |
| CC-17 Cashes $6,725.37 Check at TD Bank | | 09/18/2013 | 15:07:00 |
| (###) ###-5066 OLANIYI | (###) ###-4609 "T" | 09/18/2013 | 15:21:00 |
| CC-17 Cashes $6,725.37 Check at TD Bank | | 09/18/2013 | 15:26:00 |
| (###) ###-5066 OLANIYI | (###) ###-4609 "T" | 09/18/2013 | 17:03:11 |
| CC-17 Attempts to Cash Check at TD Bank | | 09/18/2013 | 17:03:00 |
| (###) ###-5066 OLANIYI | CC-18'S Cell Phone | 09/18/2013 | 17:06:17 |
| UNSUB Cashes $9,691.42 Check at TD Bank | | 09/18/2013 | 17:15:00 |

81. When shown the relevant phone records and asked about the calls and texts with OLANIYI, CC-18 stated that OLANIYI would call or text to advise he was about to send someone into a TD Bank branch with a check to cash and to confirm that CC-18 was ready to receive a call from the bank. At some point thereafter, TD Bank

called CC-16's cell phone number and CC-18 answered and provided authorization for cashing the check in question drawn on the TD Bank account ending in -3785. CC-18 recalled speaking to TD Bank in this manner approximately ten or twelve times.

**Navy Federal Credit Union Execution of the Scheme**

82. Further review of the phone records provided by Cricket revealed that OLANIYI's (###) ###-5066 number called NFCU approximately eight times between September 13 and 21, 2013. Based on investigation, law enforcement learned that, during September 2013, the NFCU accounts of both K.G. and K.E. had counterfeit checks totaling $31,083.52 deposited at various NFCU branches in Prince Georges County, Maryland.

83. Bank surveillance images provided by NFCU show OLANIYI making a $600 ATM withdrawal from the account belonging to K.G. on September 11, 2013, at the branch located in Laurel, Maryland. Additional bank surveillance images show an individual consistent with OLANIYI conducting balance inquiries and an additional withdrawal in the amount of $360 from the account belonging to K.G. on September 12, 2013, at branches located in Laurel, Maryland.

84. Additional bank surveillance images provided by NFCU show "Tai" depositing a fraudulent check in the amount of $8,832 to the account belonging to K.E. on September 18, 2013, at the branch located in Manokeek, Maryland. Additional surveillance images show "Tai" depositing an additional fraudulent check in the amount of $2,300 to the account belonging to K.E., as well as a $180 withdrawal from the account, on September 21, 2013, at the branch located in Largo, Maryland.

85. During interviews with law enforcement, CC-16 and CC-18 identified the individuals in the NFCU surveillance as OLANIYI and "Tai."

## STATEMENTS BY OLANIYI

86. On or about November 11, 2012, an agent with the USSS interviewed OLANIYI at a Federal Correctional Institution in Fort Dix, New Jersey. During the interview OLANIYI stated that his nickname is "Big Africa" and that everyone knew him by that name.

## CONCLUSION

87. Based on the foregoing, your affiant believes there is probable cause to believe that between in or about February 2011, and in or about September 2013, within the District of Columbia and elsewhere, TEMITOPE OLANIYI committed a violation of Title 18, United States Code, Sections 1349 and 1344 (Conspiracy to Commit Bank Fraud).

________________________________________
CHRISTOPHER SAUNDERS
UNITED STATES POSTAL INSPECTOR

Sworn and subscribed to before me this _______ day of October, 2015.

__________________________________
ALAN KAY
United States Magistrate Judge